Good morning, Your Honor, and may it please the Court, my name is Josh Lee, I represent the defendant-appellant vessel owner in this lawsuit brought under 33 U.S.C. Section 905B by a longshoreman for personal injuries. I use the term longshoreman somewhat loosely. We're here today, really, because an inexperienced and— Was he a longshoreman? Was he a stevedore? Was he a laborer? Was he none of the above? Does the label for him matter? And I don't mean that in a flippant way at all. No, of course not, Your Honor. In the description, some says he's hired as a laborer, and one might think, well, just a day laborer. Then he says he was a forklift driver, and then he says he was a loader. And then there's some characterization in terms of what stevedores do, and then longshoremen. So does the label or denotation of what his job actually was inform greatly, you know, sort of where we end up? Well, Your Honor, I'll give you a classic lawyer's answer. The answer to your question is yes and no. From a legal standpoint, of course, certainly it matters that he was a longshoreman. I think regardless, from a legal job classification standpoint and a standpoint of what legal regime his claim is brought under, he's clearly a longshoreman. He's engaged in classical longshoreman's work of loading and unloading vessels. I don't think you get any more longshoreman than that. So I think from a legal classification standpoint, Mr. Kiwi certainly is a longshoreman. His claim against a vessel owner is limited by and cabined by the Cyndia case and by the duties owed by the vessel owner under Section 905B as those have been laid out by the Supreme Court and clarified by this Court. Now, from a practical and fact-specific standpoint, and I'm sorry, let me back up even further. Certainly from the standpoint of my client, the vessel owner, as far as we know, we've been given a full-fledged longshoreman to come unload our vessel into the barge that's been brought alongside. Mr. Kiwi, and I think this is clear from the record, the testimony of Mr. Galeano, one of the coastal cargo supervisors, he's out there as a longshoreman. He's being charged at the same rate as a longshoreman of 20 years' experience. However, we know from discovery in this case that in reality, Mr. Kiwi is, as far as his employer, Coastal Cargo, the stevedoring company, which, by the way, unquestionably was an expert and experienced stevedoring concern. Let me just ask you this. You know, there is evidence. I think you're off on the wrong track when you're making a big deal about the fact that he was so inexperienced. The brief says he's the son of a Tanzanian professor, so he can't be stupid. And the evidence in the record is that he is following, he's watching what the other stevedores have been doing, and apparently others of them were also sticking their hand on this combing. So he's just doing what the others are doing. So I really don't think it gets you anywhere. And I'm not sure that it influenced the district court that much in a legally material way that he was only on his tenth day on the job. Your beef is that liability was imposed on your client to do something that they can't do that would not have prevented the accident, right? Your Honor, you've gotten to the heart of what a big part of our argument is. I'll address very quickly the experience issue. I think where experience comes into play, and where it matters to the issue Your Honor has just brought up, is that I think the testimony was clear from the coastal cargo witnesses who were in charge of the training and development of Mr. Kiwia as he progressed from trainee to full-fledged longshoreman that this entire issue of don't stick your hand into a piece of moving equipment, don't grasp on to the hatch combing, that's something that his employer, again as an expert on experience, expected him to pick up as part of his training program, and no one took any steps to make sure that was happening. Now to your point, Judge Jones, I think you've gotten to the heart of the issue, which really is that the district court here created, I think, a somewhat new duty. The problem with the duty created by the district court, and it was in two parts. The duty was, and I believe it was in the findings of fact, I believe it was number 24, the duty imposed was before the vessel closes the hatch cover, thou shalt, number one, go warn the stevedoring supervisor, and number two, go and do a quick survey of the area to make sure there are no obstructions. And to get back to your point, Judge Jones, I think you're absolutely correct that had we been able to introduce evidence that the vessel did exactly what the district court prescribed in this case, there's really no indication that doing so would have prevented the injury. So what we have here is really sort of the worst of both worlds with this duty. It's a new, narrow duty imposed that is likely to, number one, increase the liability of vessel owners in my client's position without doing anything, really, to make sure we prevent injuries to a longshoreman like Mr. Kiwi. Is that a legal point you're making or a factual point? And the reason is because, as you know, the standard of review is quite different. If we hypothetically would reverse the district court on a factual point, we'd have to find clear error, whereas if there's an error with respect to the duty, that's a legal question. So what kind of argument is that? Well, Judge, I think the argument we're on at the moment is a little bit of a hybrid, but we've raised this, I think, in terms of both the scope of the duty in terms of what the vessel owner has a duty to warn the expert experienced stevedore about. I think what you're getting to, Judge Duncan, is the question of cause and fact is really what it is. The question of would having discharged this duty in full have prevented the injury from occurring? And I can see that's a factual question, I think, and there's an utter lack of evidence, I would argue, in the record to establish that doing what the district court says should have been done would have prevented Mr. Kiwia from having his injury. Perhaps the most glaring example of this, and I know we mentioned it in both our original and our reply briefs, is the fact that the district court found that despite his inexperience and lack of training, Mr. Kiwia would have responded appropriately had he been told don't put your hand on the combing. I don't know how you square that factual finding with the testimony in the record in which Mr. Kiwia is asked, tell me what the combing is, and he says, I have no idea. Well, besides which, it's counterfactual, and the question is, who's supposed to tell him not to do that? Who is it for posing the duty on the shipowner to get out what you say is the training, although, again, I'm not sure I see that as the most dispositive problem. To pick up on a kernel of what you just said, Judge Jones, I think the question of who is supposed to tell him X, Y, Z is an important one. All the district court says is that they were supposed to notify the supervisor, right? Then you've got another counterfactual hypothetical. Would the supervisor have yelled out to the people who were coming up over the train? Your Honor, I think you're exactly correct. We need to start making assumption upon assumption that had the warning been given to the supervisor and here I'll stray back into the training, Your Honor, although you keep telling me not to, we've got a couple week period in which Mr. Kiwia is never told about these things, never given these warnings, never given these cautionary tales, yet we're to accept in the counterfactual that's sort of imposed in this case that on this one day, this one day out of all other days, if the supervisor had been warned that we're closing the hatch covers, that day, that day he would have gone down to the barge and told Mr. Kiwia, hey, I know you're inexperienced. Before you come up, make sure you watch out for those big moving hatch covers. And I think that's certainly several too many assumptions too far, Your Honor. Let me ask you on a legal point. I mean, there's obviously an active control duty that a ship owner has in this context. The ship owner is, it seems to me, undisputedly in control of the closing of the hatch. The hatch, I would think it is undisputed that it, I hesitate to say hazard because I know that's a term of art, but it's dangerous. So, you're not denying, are you, that there is some duty with respect to the closing of the hatch that your client has? No, Your Honor, I think, and if I'm not addressing your point, please stop me. Certainly, we recognize that there is an active control duty. Certainly, I would recognize that the evidence at trial established that it was a member of the vessel crew that pressed the button, the button that closes the hatch cover. Certainly, I think, Your Honor, and I'm now going to stray a little bit into the duty to intervene, another of the syndia duties. Certainly, if the man is at the controls and he sees a hand there or if he sees someone laying the body across in the path of the hatch cover, certainly there's a duty there to exercise what control you have over that instrumentality to avoid causing an injury, but I don't think we have that in this case. There's no case that imposes this duty before this one, right? Your Honor, you're absolutely correct on that. There's no case, there's no statute, there's no rule, there's no regulation. This is entirely dictated by the district court. What's your bottom line? He just should have known better? I mean, your bottom line is he just should have known better? He, Mr. Keoya? Yeah, I mean, because you went back and forth with Mr. Hughes about, you know, he's a forklift driver. Was he supposed to train him? Was he supposed to, you know, he follows these other people, he does the same thing they do, and you said Stephen Orse. I mean, is the bottom line by virtue of being there, he should have known better than to put his hand where he did? I mean, I'm not trying to be flippant in terms of the position, but on the one hand, it's, you know, no duty here, but on the other hand, it's, you know, he just should have known better. Is that kind of the bottom line you argue? That he just should have known by the nature of putting his hand, the cover, that it was dangerous and not done it, since we know that, you know, there's the person who lowers the hatch doesn't say, hatch coming down, you know, or something to that effect. So, I mean, where does this fit? Well, Your Honor, I think we get there a little bit into the question of what sort of knowledge a longshoreman should be charged with, and I think certainly to use your phrase, Judge Stewart, I don't think it's unreasonable at all to say that a longshoreman employed by an expert stevedoring company, an expert stevedoring company that is fully aware of what these hatches can do, the fact that they're likely to be closed when there's a rain stoppage, as there were in this case, that a longshoreman employed by a company like that certainly should know better than to grasp onto Well, you know, it sounds like an accident to me. It was a momentary thing. But apart from that, what evidence is there in the record that there was absolutely no sound associated with closing the hatch? The only evidence of that, I believe, Your Honor, was the testimony of Mr. Kiewiet. So Hughes wasn't Hughes and the other fellow weren't questioned about that? Your Honor, Mr. Hughes may have given the same testimony. I don't recall that specifically. These things are 24 feet high? Is that right? They are, Your Honor. I mean, at least 24 feet when they're closing. It's just inconceivable to me that it was inaudible. Well, not only that, but to pick up on your point, Judge Jones, I think it's inconceivable that however slow they may have been moving, that their movement was imperceptible. I think if you look at Mr. Kiewiet's testimony, 618, 619 in the record, I believe, his testimony is that they're already moving as he is climbing up the Jacobs ladder from the barge. And again, we go back to no one in the stevedoring crew is bothering to tell him watch out, don't grab that when you get up there, don't put your hand in that one spot. And to get back to the point you made, Judge Jones, about this being a sudden it's, the best I can describe it, it's a reflex action. I mean, Mr. Kiewiet has, he's gotten off the ladder, he's set foot on the barge, he's turning this way to go take his lunch break. The supervisor's calling to warn him, don't put your hand on the counter. That may well have been what was happening, Your Honor. He's giving the supervisor his back, he turns and grabs himself, grabs the hatch coming to steady himself. He said that multiple times in the record, page 658 to 660 I think is a good illustration of it, that no, you don't understand I had to grab that to balance myself. So, I tend to question Your Honor, whether even had he been given a warning on the barge moments before he climbed up the ladder, hey, be careful around that hatch coming, it's a reflex action. And that supervisor didn't testify, right? That's correct, Your Honor. I'll reserve my five minutes of rebuttal, please, the Court. Okay, thank you. Sorry about this. Mr. Misko? Ms. Misko, excuse me. Thank you, Your Honor. May it please the Court. I think there were a few issues brought up in oral argument just now, and I want to address one of them at the outset because I think it has to do mainly with the standard of review. And one of it was the statement made by Mr. Lee that a new duty was created. The Court didn't create a new duty. There is a duty under Cyndia that under the active control duty, that applies not just to areas under the active control of the vessel owner, but also to equipment. And equipment seems to be forgotten in a lot of the defendant's arguments here. The equipment argument with the new duty, there's no issue, and I think you pointed out, there was no dispute in the district court that the hatch cover controls were within the sole active control of the vessel owner and the vessel crew. Can you give another example of a case involving the active control duty because I'm not really familiar with that aspect of Cyndia. Your Honor, I can't. I think there is one, I believe actually the district court referenced it in their ruling with the Turner case, 744F2nd, and that was the Turner was the stevedore required to venture outside of the area of the normal operations to an area within the ship's control and forced to cross an oil slick outside of his work area, and then he was forced out of the ship. I think there's another Davis v. Estes well that was one where the vessel owner failed to safely position the vessel constituted a breach of the active control because they were within the control of where . . . You're saying those are cited by the district court? Yes, Your Honor. They are actually on the record. I'll give you the record cited. It's page 420 and 421 of the record on appeal. Well, the district court, with respect to the active control duty, it's finding 25. The district court found that the duty encompassed warning and surveying the area. Yes. Yes, Your Honor. Okay. The district court said the Oslo Boat Crew failed to warn a coastal cargo representative and survey the area surrounding the hatch combing before closing the hatch. That's sort of a legal finding, I think, as to the extent of the duty. Now, we have to have causation, though, right? Correct, Your Honor. Do the undisputed facts show that when Mr. Kiwia placed his hand there, was the hatch already moving? The hatch had already started its movement. The issue . . . So, how could a breach of the duty then have caused the injury if it was already moving? It was multiple . . . both witnesses, both Mr. Hughes and Mr. Kiwia testified that it was moving very slowly and pin-drop quiet. Right. So, my point is that let's assume they have a duty to warn and survey. So, I have to survey to make sure nobody's in harm's way before I press the button. I have to warn that I'm going to press the button because that's going to happen. But if it's undisputed that the incident occurred after it was moving already, how could the breach have caused the injury? Because it was not moving in such a way that anybody saw, even Mr. Hughes, who was standing there, could not tell that it had started moving because, as he said multiple times, they expect a warning and he did not receive one. He did not receive one and he does not know of anyone else who received one. What would the warning have been? We're closing the hatch cover. Or someone walking around the hatch cover and saying, hey, Mr. Hughes, you may want to move your bag because we're closing the hatch cover. At which point he testified, I would have called down to the guys on the barge and said, they're moving they're going to start closing up the hatches now. Let's get off the boat and watch your hands. But is there any The timing of that is critical, though. We don't know how far the thing had moved, right? No. I mean, we don't know whether it was up like that or already here. It's an accordion movement I know, I had to watch it on a video. And the testimony, I think, was that the Jacob's Ladder was placed at approximately the midpoint of the It's moving like that or, you know, it's moving, sorry, it's moving along its track along its track to close and he doesn't see something 24 feet high that's, quote, imperceptibly moving. It sounds like an accident. It sounds like something, even if they said, watch, it's moving he's turning and doing it very quickly just to maintain balance. But the issue is, there is no evidence that any warning was provided, and this is where I get into But it goes back to the question, what would a warning have done? Would he rather have fallen face down on the wet deck or touched his fingers instantaneously and momentarily, just to, I mean, he's a man in the prime of life, presumably, or they wouldn't have hired him Understood, but these are also, it's a wall, it's the hatch coming up of a wall Had he been warned, he could have put his hand on the wall to steady himself as opposed to on top of the hatch. Is there evidence in the record about any of that? About him putting his hand on the wall? Correct. He said he would not have touched the hatch going to steady himself. There's also testimony that there is a wall and their expert detailed the height of the wall and that it would have been possible to do so. In fact, that's what when, before the district court several of the witnesses, Mr. Hughes and Mr. Dean, defendants expert, demonstrated how they would have gotten off in person and how they would have gotten over and what they would have grabbed to steady themselves. The issue is at the end of the day, whether or not what Mr. Metwesner Puglia would have done with a warning was a credibility determination that the judge made based on the testimony that she heard both from him and from Mr. Hughes. Suppose they had used two men to close the hatch covers where normally you would have used one and one of them is pushing the button and the other is going around. Suppose he's only halfway around and it's a big boat and he, hatch cover going down. And Kiwi does exactly what he did. Then are you going to argue that the warning is insufficient? No, there wouldn't have been an issue of no warning. There just wasn't a warning because Mr. Hughes would have also heard it. Because he's 20 feet away and Kiwi was paying attention to standing up properly and so on. I'm not making that argument. I'm making the argument that there was no warning given. That is the insufficiency in the breach of the duty. Besides that, she also talked about the sufficiency of a warning on a deck like this in a very large open space is highly dubious. One thing that I thought about was, well, would it be like a forklift where you have to put buzzers on forklifts when they're moving around in the warehouse facility? Apparently, there was no testimony about that kind of thing, right? An automatic buzzer when the hatch goes up or down? There was testimony about that. Our expert testified that that is something that would have been preferable. The district court, as far as warning was, the duty to warn went to the stevedore supervisor. The duty to warn was both making sure that the hatch was clear of any problems and anything on the hatch and also just warning someone on the coastal cargo crew, which was not done. There's no testimony anywhere in the record that there was a warning given, anywhere. They said, had they been able to introduce evidence of that, they would have. There is no evidence of that. You agreed that if there was a duty to survey to avoid obstructions, that that would not have caused the accident. You're not defending that, right? I'm sorry. The question is, if there was a duty to survey to avoid somebody obstructing the hatch closing, that that would not have caused the accident.   It would not have caused the accident. After all, what Mr. Kiwi did was a reflexive, momentary clutch. It is only speculative that surveying, visually surveying would have prevented him from doing that. The issue goes to, had there been a surveillance and seen Mr. Hughes' bag and they would have warned him, then he could have told the crew below, they're closing the hatch, just watch your hands when you come up. That point is a question of what Mr. Kiwi would have done. He said he would have not put his hands where he put them had there been a warning of some sort. I'm sorry, Judge Stewart. Just a quick question. Was the matter of industry standard about warning something that the experts, we've got the battle of experts and the district court believed one or the other. I read Mr. Hughes' testimony and he's asked by counsel back and forth about sometimes they warn, sometimes they're not. Was there evidence about quote, industry standard about giving warnings or is that just totally a matter of . . . Both experts testified, Your Honor, about warnings and notice being given of closing hatches. Plaintiff's expert testified that warnings are typically given and there are alarms on many ships that are given. Defendant's expert testified, to his experience, there is always a discussion that the hatches are going to be closed between the vessel crew and the steep doors. Even their own expert said that is an expected conversation that would occur when the crew is getting . . . And who is conversing? Is Mr. Kiwi conversing? No, someone from the coastal cargo crew who would then give the information to the rest of the guys who all have radios. Is there evidence that the training by coastal cargo incorporated this idea of look, when the closing of the hatch is dangerous, there's this combing, you shouldn't put your hand there when it's moving? Is there evidence that . . . The reason I'm asking is because I think there are cases that say the vessel owner is entitled to hire steep doors who are properly trained. Correct, but I think then that goes into . . . To answer your question, no, there is no specific portion of the training that says don't put your hand on hatch covers because then I think it goes to the other issue which is the other expert experienced had steep doors on that ship that day all did the same thing. Mr. Hughes testified that given the narrowness of the walkway, there was really not any way for anybody to get off of that Jacobs ladder and onto the ship without grabbing the hatch combing railing. According to you, they should have all grabbed the wall. If it were closing and a warning had been given, that was a possibility. But the others were all experienced. Yes. They were all experienced and they all did the same thing. I think that's when the training issue is . . . all of the experts were doing the same thing on that vessel on that date. I don't understand. Okay, never mind. I'll look at the record. I'm sorry? Nothing. Talking to myself. Assuming some liability on the part of the defendants here is Mr. Kuvia. Is he susceptible to any finding of apportionment of fault to him? Based on the record and the judge's findings of fact, I don't think so because he did not know that this was a dangerous item and that's part of the inadequate training that she found. If you don't know that something is dangerous at the time that it's closing . . . I gather there was a problem with his proficiency in English at trial or is that a misperception? No, Your Honor. He is proficient in English, but I will represent to you that it is a heavy accent. He is Tanzanian. English is his second language, but it is heavily accented and some of the words are not the clearest they could be sometimes. And the trial occurred how long after the injury? A couple of years? Yes, Your Honor. And he had been in the U.S. how long when he got this job? About a year, right? Longer than that, Your Honor, several years at that point. All right. Longer than that. There were just a few issues and I think that comes across in part of the district court's decision is both hearing and just listening and watching everybody testify because there are a few times in the record it says, you know, I turned this way where somebody actually did at trial turn this way and visually explain it to the district court and I think there's no . . . I think something to keep in mind is that if the . . . even the United States Supreme Court, if the district court's account of the evidence is plausible based on the record in its entirety, there's no reason for reversal. Even if this court would have maybe weighed the evidence a little bit differently, there's a great deference here and these are all clear error issues including the damages award which I've got five minutes if the court would . . . Why don't you talk about the damages award which is, you know, it's an unfortunate injury but he got compensated under longshore benefits, right? He did. He was compensated under longshore benefits but that is not . . . there's a reason that 905B cases exist is it's to prevent and to allow for longshoremen to seek compensation benefits outside of the realm of compensation when it is not their fault or when it is another third party vessel owner's fault, hence the reason for the intervention in the case as well because his employer and their workers' compensation insurer are entitled to get some of the money back that they paid to him because they are not at fault or 100% at fault for his injury. It was a catastrophic injury. It was a traumatic amputation. There was discussion from him and his treating physicians about how it has affected him not just physically but also emotionally. The entire award encompasses not just pain and suffering damages physical but also emotional. He's permanently disfigured. There was discussion by both Dr. Howes and Mr. Cahuilla about how this has affected him emotionally and in his life and with his relationships because again he has lost these three fingers on his dominant hand and Dr. Howes actually testified extensively at trial about the cultural differences given his raising in Tanzania and how this has affected him more so than some other plaintiffs would just given he is very prideful and proud but also very stoic and doesn't talk about pain very often so when the record says I'm only having a two or three or four pain it may not reflect what he's actually feeling because he's very closed off and likes to portray himself as a not likes to but portrays himself in a life that is favorable and amicable to those who meet him. I think when looked at as a whole between the diagnosis and the traumatic injury when you break it down the 950 is substantially based on what the district court saw in both physical emotional and disfigurement damages. Does the court have any other questions? No more questions thank you. Thank you. Your Honor we left off on the damages question and I'll pick back up there very briefly if I may. Judge Jones I don't know if you're familiar with the Robertson decision from back in the mid 80's I think you actually may be we cited it extensively in the briefs I think on the question of excessiveness of the damages it's perhaps one of the easiest ways to sort of differentiate the case on which the district court relied from the circumstance of Mr. Kiwi and we kind of dissected the Robertson case in the brief so I won't do that again but a very clear obvious palpable distinction I think between the facts of Robertson and the facts of Kiwi are the fact that Mr. Robertson had painful neuromas in his hand as a result of the traumatic amputation that medical science in the mid 1980's when he was injured was not able to deal with and the finding of the district court this is 600 F SUP at 796 was that Mr. Robertson just had to simply live with that and he was going to endure a lifetime of pain due to those neuromas. Mr. Kiwi had those neuromas surgically removed and corrected within less than a year of his accident so if that is not a distinction with a difference then I'm not really sure what is. To touch on a few of the points that were made during Ms. Miskin's presentation we've talked a lot today about counterfactuals and I think in some respects your honors we don't need to get into counterfactuals. The counterfactual of well what would Mr. Hughes have done had he been told the hatches are about to close. Well we don't need to ask counterfactual there Mr. Hughes tells us on pages 593 and 594 of the transcript. What would you have done differently had the warning been given? The answer after some objections I would have just told everybody to come on up. Tell everybody to come on up. So certainly no indication there that Mr. Hughes is going to go into any sort of detailed warning to his co-workers. Come on up but make sure as you come up you don't reflexively grab on to the combing because you might lose a few fingers. Mr. Kiwia to I'm forgetting now who was making the point about whether Mr. Kiwia should have grabbed the combing esteady himself or could he have grabbed the hand railing that was outboard of him on the vessel. Well Mr. Kiwia was asked directly about that when I was cross 658 through about 660 of his testimony I specifically tried to make that point with him. You grabbed the combing but you had a perfectly good hand rail you could have grabbed on to and his insistence was based on the way he spun back around and he had to steady himself that was the only thing he felt he could grab to steady himself and that was a reflex action that he simply couldn't stop. As far as the training that Mr. Kiwia was going to receive and whether or not the idea of safety around the hatch covers was part of the Coastal Cargo training regimen I think the testimony of Mr. Davis who was the hiring manager for Coastal Cargo was pretty clear on that point. There was certainly no sort of classroom instruction, no handouts given about that, no tests given but they expected that or Mr. Davis said he expected that to happen as part of the on the job training process that Mr. Kiwia was in the midst of and when Mr. Davis was confronted with the fact of Mr. Hughes' testimony who said wait a second if I was supposed to be training this guy not to put his hand on the hatch combing that's news to me. Mr. Davis was sort of shocked and saddened to hear that that was the case. So I think we can sort of dispense with the notion that there was any sort of effort on Coastal Cargo's part to include as part of its longshoreman training program any sort of inculcation into trainees that hey you need to exercise caution around those hatch comings. I think Judge Jones you sort of drilled down to the essence of this case and it's the break in the chain of factual causation between any alleged violation of this duty imposed by the district court and the injury that was sustained by Mr. Kiwia and the big break in that factual chain obviously is the fact that we have no way of knowing beyond rank speculation that any warning given to the longshoreman supervisor would have made it all the way down to Mr. Kiwia. And again to take this out of the realm of counterfactual we know exactly what Mr. Kiwia was told in this case. He wasn't told it's raining. He wasn't told the hatches are closing. He wasn't told why anybody was doing anything. What Mr. Kiwia was told was it's time for lunch. Go eat your lunch. That's page 616 of the trial transcript. That's the only thing that filtered down to Mr. Kiwia and I think we have no reason to assume otherwise. Thank you Your Honor.